UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

WILLIAM QUINONES,

|  |  |  |
|---|---|---|
|  | Petitioner, | **REPORT**<br>**and**<br>**RECOMMENDATION** |
| v. |  |  |
| JOHN BURGE, Superintendent of Auburn<br>  Correctional Facility, |  | **05-CV-497S(F)** |
|  | Respondent. |  |

_____

APPEARANCES:         WILLIAM QUINONES, *Pro Se*
                     00-B-1177
                     Auburn Correctional Facility
                     135 State Street
                     Auburn, New York 13024

                     FRANK J. CLARK
                     District Attorney, Erie County
                     Attorney for Respondent
                     STEVEN MEYER
                     Assistant District Attorney, of Counsel
                     25 Delaware Avenue
                     Buffalo, New York 14202

## JURISDICTION

Petitioner William Quinones, acting *pro se*, commenced this proceeding on July 20, 2005, requesting habeas corpus relief under 28 U.S.C. § 2254. On November 8, 2006, Honorable William M. Skretny referred the matter to the undersigned, pursuant to 28 U.S.C. § 636(b)(1)(B), for report and recommendation.

## BACKGROUND

On July 20, 2005, Petitioner William Quiñones ("Petitioner" or "Quiñones"),

proceeding *pro se*, filed a Petition (Doc. No. 1) ("Petition"), commencing this proceeding seeking habeas relief, challenging Petitioner's conviction for weapons possession and murder in New York Supreme Court, Erie County.  Petitioner's asserts prosecutorial misconduct as the sole ground for habeas relief, arguing that the cumulative impact of the prosecutor's improper and inflammatory remarks during trial and summation deprived Petitioner of due process.  Petition ¶ 12(a).

On October 3, 2005, Respondent filed an Answer (Doc. No. 5) ("Answer") opposing the Petition, and a Memorandum of Law (Doc. No. 6) ("Respondent's Memorandum"), and submitted the state court records pertaining to Petitioner's conviction, including Petitioner's motion to set aside the verdict, appeal of the conviction to the New York Supreme Court, Appellate Division, Fourth Department ("Appellate Division"), and application for leave to appeal to the New York Court of Appeals.  In further support of the Petition, Petitioner filed on October 24, 2005, a Memorandum of Law (Doc. No. 7).  Oral argument was deemed unnecessary.

Based on the following, the Petition should be DISMISSED, and a certificate of appealability DENIED.


## **FACTS**[1]

Following a jury trial, Petitioner was convicted in New York Supreme Court, Erie County, on February 4, 2000, of second degree murder (New York Penal Law ("N.Y. Penal Law") § 125.25[1]), second degree criminal possession of a weapon (N.Y. Penal

---

[1] Taken from the Petition, Response, Memorandum, exhibits and state court records filed in this proceeding.

Law § 265.03), and two counts of third degree criminal possession of a weapon (N.Y.

Penal Law § 265.02[1] and [4]).  Petitioner's conviction relates to the June 8, 1997

shooting death of Natanel Martinez ("the victim" or "Martinez").  At Petitioner's jury trial

on the charges, conducted on February 1, 3 and 4, 2000 before Erie County Court

Judge Timothy J. Drury, Petitioner was represented by Robert Perk, Esq. ("defense

counsel") or "Perk"), with Assistant Erie County District Attorney Patricia Carrington (the

prosecutor" or ""Carrington") serving as the prosecutor.

　　　　Because the murder weapon was never recovered, the case largely depended

on the testimony of an eyewitness and friend of the victim, Carlos Rosa ("Rosa").  In

particular, in the afternoon of June 8, 1997, a clear and sunny day, Rosa, accompanied

by Martinez, drove in Rosa's vehicle, a station wagon, to Maryner Towers Apartments,

located on Efner Street near its intersection with Virginia Street in Buffalo, New York,

where they saw a woman named "Virgin", from whom they believed marijuana could be

purchased, standing in front of Virgin's apartment with others including Petitioner, whom

Rosa knew by the name of "Hunter," Petitioner's brother, Victor ("Victor"), and someone

named Junior ("Junior"). Tr.[2] at 85-90, 94, 101, 127-28.  Although Rosa did not consider

Petitioner to be a friend, Rosa had known Petitioner, Victor and Junior for a year, and

saw Petitioner three or four times a week.  Tr. at 91.   Martinez exited Rosa's vehicle,

while Rosa, who remained seated in the vehicle's driver's seat wearing sunglasses, had

an unobstructed view of Martinez approaching Virgin intending to purchase the

marijuana, but then looked away and therefore was not sure whether Martinez actually

---

[2] "Tr." references are to the page of the trial transcript submitted as part of the state court record.

purchased any marijuana from Virgin.  Tr. at 92-95, 126-27.  Three to five minutes had elapsed when Rosa next observed Martinez as Martinez was returning to Rosa's vehicle, and noticed the others, including Virgin, Petitioner, Victor and Junior were no longer within Rosa's view. Tr. at 96, 128, 137.  Upon reaching Rosa's vehicle, Martinez entered through the right front passenger door, sat in the right front passenger seat, and closed the door.  Tr. at 96, 101, 129, 131.

As Rosa started the vehicle to leave, he heard a gunshot and, looking over his right shoulder through the rear windshield, saw Petitioner standing on the sidewalk shooting a pistol at the vehicle from 10 feet behind the bumper on the passenger side. Tr. at 97-99, 101, 129-31.  According to Rosa, Petitioner, holding a black, six to eight-inch long pistol in his right hand and a bandana in his left hand, aimed the pistol straight out from his body at shoulder height toward the vehicle and Rosa and Martinez, and moved his hand from side to side while consecutively shooting, without any breaks in between, 15 to 20 shots over a five-second period.  Tr. at 99-101, 129-30, 132.  Rosa observed that the vehicle's rear windshield had been shattered from a gunshot, saw that Martinez was bleeding from a gunshot wound to the left side of his head, and drove away from the curb onto the street intending to take Martinez to Children's Hospital ("the hospital") in Buffalo.  Tr. at 101-05, 132.  Although Martinez was unable to speak with Rosa during the ride to the hospital, Rosa observed Martinez was trembling and saw a pulse in his neck. Tr. at 105-06.

Upon reaching the hospital, hospital security guards removed Martinez from Rosa's vehicle, and Rosa spoke with several police officers at the hospital, identifying "Hunter" as the shooter.  Tr. at 106.  Rosa went with the police officers to Central

Booking at Police Headquarters where Rosa gave a statement regarding the shooting and identifying Petitioner as the shooter.  Tr. at 107-08.  Later, the police brought Victor before Rosa and asked if Victor was the shooter, and Rosa stated he observed Victor among the people standing in front of Virgin's apartment just prior to the shooting, but denied that Victor was the shooter.  Tr. at 109.

Rosa next accompanied the police to the location where the shooting occurred. Tr. at 107-08.  According to Rosa, upon returning with the police to the scene of the crime, the police officers covered Rosa's face with a shirt to shield Rosa's appearance from other people near the crime scene.  Tr. at 108.

Following the shooting, Rosa left his home on Buffalo's West Side and took up residence in a motel in Niagara Falls, New York ("the motel") because he believed his life was in danger.  Tr. at 109-10.  Rosa was still living in the motel when two Buffalo Police Officers met with Rosa a week after the shooting.  Tr. at 109, 133.  The officers advised Rosa of his Fifth Amendment rights and then asked whether Rosa shot Martinez, to which Rosa responded he did not and again identified Petitioner as the sole shooter.  Tr. at 133-35.  Rosa maintained that he had never had any problem with Petitioner prior to June 8, 1997, when Martinez was murdered. Tr. at 135.

The circumstantial evidence presented at trial included testimony from Erie County District Attorney Investigator Charles Craven ("Craven") (Tr. at 43-53), Buffalo Police Officer Sharon Grande ("Grande") (Tr. at 143-48), Buffalo Police Officer Jimmie Pitts ("Pitts") (Tr. at 163-71), Buffalo Police Detective Reginald Minor ("Minor") (Tr. at 171-78), Buffalo Police Officer Mark Stambach ("Stambach") (Tr. at 178-200), Buffalo Police Detective Sergeant Henry Smardz ("Sgt. Smardz") (Tr. at 200- 53), forensic

chemistry expert Richard Spencer ("Spencer") (Tr. at 253-61), Erie County Central

Police Services Senior Firearms Examiner Bert Pandolfino ("Sr. Firearms Examiner

Pandolfino") (Tr. at 261-79), Director of Central Police Services Laboratory Michael

Dujanovich ("Dir. Dujanovich") (Tr. at 280-85), and Associate Chief Erie County Medical

Examiner Sungook Baik, M.D. ("Dr. Baik") (Tr. at 286-324).  All witnesses involved in

the police investigation consistently testified that the evidence indicated the bullet that

killed the victim was shot from someone standing outside and behind the passenger

side of the vehicle.  *See, e.g.*, Tr. at 204-10, 226-30 (Sgt. Smardz testifying regarding

evidence retrieved from Rosa's vehicle, including a bullet from the front passenger

compartment floor, a bullet jacket dug out of the back portion of the rear folding bench

seat, a slug in the spare tire well located toward the rear of the vehicle's passenger

side, glass from the vehicle's shattered rear windshield that was primarily recovered

from the vehicle's cargo area, and a spent lead slug found near the curb on Efner Street

near its intersection with Virginia Street); Tr. at 290-93 (Dr. Baik testifying as to the

absence of any autopsy evidence of a "contact wound," indicating the mortal shot to the

victim's head was fired from a distance in excess of 18 inches).

Also testifying for the prosecution were two witnesses living near the murder

scene on June 8, 1997, including Joyce Elliott ("Elliott"), and Robert Grimes ("Grimes").

Elliott testified that at the time of the shooting, she was sitting inside her apartment,

facing glass doors opening onto a grassy area in the back of the building, watching her

children and grandchildren play outside, when Elliott observed two Hispanic men run

past the grassy area away, as if running away from the area where the shooting

occurred, and then heard a series of gunshots.  Tr. at 55-65.  Grimes testified that at the

6

time of the murder, Grimes, who lived with four relatives, was in his the living room on the first floor of his apartment, located in a complex that was separated from Maryner Towers by entrance and exit ramps to the New York State Thruway, when he heard a "loud banging noise" that sounded like "glass breaking upstairs."  Tr. at 66-68.[3]  Upon investigating the source of the noise, Grimes found that a bullet had entered the kitchen in the apartment's upper floor, pierced a kitchen cabinet, shattering a bottle of syrup and landing on the kitchen floor.  Tr. at 68-70.

Sr. Firearms Examiner Pandolfino, testifying as an expert, stated that the bullets recovered from Grimes's apartment, the curb at the intersection of Efner and Virginia Streets, and from within the vehicle were all fired from a .38 caliber weapon and would have the ability to travel between one-half to three-quarters of a mile.  Tr. at 262-75. Significantly, the victim's fatal injury was a "through and through wound," wherein the bullet enters and then exits the body, and the type of wound of which a .38 caliber bullet is capable of producing, Tr. at 288-90, 309-10, and the bullet recovered from the floor of the vehicle's front passenger compartment floor, bearing trace evidence of human tissue, was .38 caliber.  Tr. at 230, 255-56.

No witnesses testified on Petitioner's behalf; rather, the defense presented was limited to cross-examination of the prosecutor's witnesses in an attempt to create reasonable doubt based on whether Rosa possibly fired the fatal shot.  For example, on cross-examination, Defense counsel elicited from Rosa that Rosa was arrested on November 3, 1999 and convicted on a felony weapon possession charge for which

---

[3] Sgt. Smardz testified that although located on Carolina Street, Grimes's apartment was directly behind the area where the shooting occurred, consistent with Grimes's testimony.  Tr. at 219.

Rosa was sentenced to probation.  Tr. at 124-25.  Rosa, on cross-examination, also readily admitted to having used marijuana and that the June 8, 1997 murder of Martinez occurred while Martinez accompanied Rosa in an attempt to purchase marijuana for both Martinez and Rosa. Tr. at 125-28.  Defense counsel also cross-examined Rosa regarding Rosa's opportunity to observe the shooting given the brief (five seconds) period of time over which the shots were fired, the fact that Rosa was in the process of driving away from the shooter, and that the shooter was standing behind Rosa's vehicle. Tr. at 129-32.  Perk also raised on cross-examination the fact that the police had questioned Rosa as to whether Rosa had possibly shot Martinez. Tr. at 133-35.  Finally, defense counsel, on recross-examination, questioned Rosa about the fact that despite having been shown, by the Buffalo police, a picture of Victor wearing the same shirt as the shooter, Rosa insisted Petitioner was the shooter.  Tr. at 137-38.

During summation, the prosecutor made four remarks commenting on Rosa's credibility to which defense counsel objected as improper, inflammatory, and beyond the evidence.  Three of the four objections pertained to the prosecutor's remarks regarding Rosa's testimony and decision to testify.  Two of the objections were sustained, one resulted in an instruction by the court to the jury to disregard the prosecutor's comments, and the fourth was overruled.  Specifically, defense counsel objected, characterizing as "outrageous innuendo" the prosecutor's comment that "Carlos [Rosa] is brave, and he has a conscience, and he came in here and put his own life in jeopardy . . . by pointing out that man [Petitioner] as [the murderer]."  Summation

Tr.[4] at 54-55 (bracketed text added).  Judge Drury sustained the objection to this comment, instructing the jury to disregard the comment insofar as "its not borne out by the facts [*sic*]."  Summation Tr. at 55.

Judge Drury also sustained defense counsel's objection to the prosecutor's comments regarding Rosa's arrest and conviction, a year and a half after the murder, for weapons possession.  Summation Tr. at 69.  In particular, the prosecutor stated

> It's true, he [Rosa] readily admitted that a year and a half after this [murder] he got into some trouble and got a conviction for possession of a weapon was he was put on probation.  And there's absolutely no reason to indicate that had anything to do with this case, other than some suggestion he's [defense counsel] made to you.  And I think that you'll, when you think about what he went through, it might not surprise you that he had a weapon.

Summation Tr. at 69.

Judge Drury gave a curative jury instruction when defense counsel objected to the prosecutor's summation remark that "[t]he bravest thing Carlos Rosa has ever done in his life is come into this courtroom and accuse that man [Petitioner] of killing his friend . . . " explaining that "no one in this courtroom, save him [Rosa], knows how vicious this man [Petitioner] is - -."  Summation Tr. at 48.  Specifically, Judge Drury informed the jury that they were free to either accept or disregard the prosecuting attorney's closing arguments based on how much sense the arguments made.  Summation Tr. at 48-49.

Judge Drury, however, overruled defense counsel's objection to the prosecutor's comment that Petitioner purposefully "executed" the victim while in the company of Petitioner's friends and in a neighborhood where Petitioner was well-known so as to

---

[4] References to "Summation Tr." are to the page of the transcript of the prosecutor's summation, which has been separately filed as an exhibit to the Petition.

reduce the possibility that any witnesses would agree to assist with the inevitable police investigation.  Summation Tr. at 61-62.  The prosecutor's specific summation remark to which defense counsel objected was

> when an execution like this is planned, you're gonna pick your spot, and you're gonna pick the people you're with.  And he [Petitioner] was with Victor and Junior.  And those are people he knows.  And you don't expect them to come forward and help the police in a case like this.  Nobody from the Mariner [*sic*] Homes came forward and helped the police."

Summation Tr. at 61-62.

At the close of the prosecutor's summation, defense counsel moved for a mistrial or a curative jury instruction as to three aspects of the prosecutor's summation, including the prosecutor's (1) description of the shooting death of the victim as an "execution" despite the absence of any indication Petitioner knew Martinez before the shooting[5]; (2) innuendo that Petitioner was "some raving lunatic mad man killer" whom people feared; and (3) suggestion that residents of the neighborhood where the murder occurred typically would not voluntarily report knowledge of such crime.  Tr. at 405-07.  The motion was denied as to the request for a mistrial, but granted as to the request for a curative instruction regarding the prosecutor's characterization of the murder as an "execution," as well as to remind the jury that any verdict of conviction was to be based only on evidence the jury found credible.  Tr. at 410-12.  When charging the jury, Judge Drury specifically instructed that the jury (1) determines the truth, uninfluenced by sympathy or prejudice, Tr. at 413; (2) deliberates and decides the facts, Tr. at 413; (3) is the sole and exclusive judge of the facts and of the weight and credibility of the various

---

[5] No evidence presented at trial suggested that Petitioner's killing of Martinez was premeditated.

witnesses's testimony, Tr. at 415; (4) should not consider what the attorneys state is the law, Tr. at 416; (5) should not consider or speculate as to matters not in evidence, Tr. at 418; (6) should not consider testimony excluded by the court, Tr. at 419-20; (7) should not consider the attorneys' arguments as evidence, Tr. at 420; and (8) not to be affected by sympathy for the defendant, the victim, or any witness, nor be influenced by possible punishment to the defendant, Tr. at 421.5.  Judge Drury further instructed that the jurors were to "exercise the same common sense and good judgment" used in their daily lives to evaluate each witness's credibility, taking into consideration, *inter alia*, each witness's "demeanor and mannerisms on the stand," apparent intelligence or lack thereof, whether the witness had any personal interest in the trial's outcome which could cause the witness to be less than truthful, the fact that the witness may have a criminal record, and that if the jurors determined a witness had testified falsely as to a material fact, the jurors were free to disregard such witness's entire testimony or only that portion containing the falsehood.  Tr. at 416-18.

On February 4, 2000, the jury returned a verdict convicting Plaintiff on all three charges.  On March 28, 2000, Petitioner moved in New York Supreme Court, Erie County, pursuant to N.Y. Crim. Proc. Law § 330.30(1) ("the § 330 motion"), to set aside the verdict on the ground of prosecutorial misconduct based on comments Carrington made during trial and her summation.[6]  On May 4, 2000, Judge Drury denied the motion on the basis that none of the four challenged statements that had been

---

[6] Petitioner has withdrawn as a ground for habeas relief his assertion, Petition at 5, that the prosecutor improperly elicited trial testimony from Rosa regarding an out-of-court identification of Petitioner as the murderer made by Rosa at Police Central Booking based on an unduly suggestive photo array containing only Petitioner's picture.  Petitioner's Memorandum at 2 n. 1.

preserved for review, either alone or cumulatively, so tainted the trial as to deny

Petitioner due process requiring a new trial.  May 4, 2000, § 330 Motion Decision at 9.

As to other trial and summation comments by the prosecutor for which no objection was

made, Judge Drury stated that such other comments were not preserved for review on

the § 330 motion and, as such, could be "considered by an appellate court only as a

matter of discretion in the interest of justice . . . ."  *Id.*  (citing N.Y. Crim. Proc. Law §

470.15(6)(a) (permitting an appellate court to consider, in the interest of justice, matters

"not duly protested at trial . . . " in accordance with N.Y. Crim. Proc. Law § 470.05(2))).

On May 20, 2000, Plaintiff was sentenced to concurrent terms of imprisonment of

25 years to life on the murder conviction, seven and one-half to 15 years on the second

degree weapons possession conviction, and two and one-third to seven years on the

third degree weapons possession conviction.

Petitioner timely filed a notice of appeal, asserting as grounds for the appeal, as

relevant to the instant habeas petition, prosecutorial misconduct based on the same

comments made during the prosecutor's summation that were considered by Judge

Drury on the § 330 motion.  On March 19, 2004, Petitioner's conviction was

unanimously affirmed by New York Supreme Court, Appellate Division, Fourth

Department.  *People v. Quiñones*, 773 N.Y.S. 2d 671 (App. Div. 4th Dep't 2004).  Leave

to appeal to the New York Court of Appeals was denied on June 23, 2004.  *People v.*

*Quiñones*, 816 N.E.2d 207 (N.Y. 2004).  This proceeding followed.

## DISCUSSION

12

1.      **Standard of Review**

In reviewing a state prisoner's petition pursuant to 28 U.S.C. § 2254, a district

court makes an independent determination as to whether the petitioner is in custody in

violation of his rights under the Constitution or any laws or treaties of the United States.

*Coleman v. Thompson*, 501 U.S. 722, 729 (1991), *reh'g denied*, 501 U.S. 1277 (1991).

A state petitioner's federal habeas corpus petition may be dismissed if the petitioner has

not exhausted available state remedies as to any of his federal claims, *Rose v. Lundy*,

455 U.S. 509 (1982), although under the Antiterrorism and Effective Death Penalty Act

of 1996 ("AEDPA"), a federal court is permitted to deny a state prisoner's habeas

corpus petition on the merits even though the prisoner has not exhausted available

state remedies.  28 U.S.C. § 2254(b)(2).

In reviewing habeas petitions, federal courts do not function as appellate courts

to review matters within the jurisdiction of state courts, or to review specific rulings and

decisions of state trial and appellate courts not involving federal constitutional issues;

rather, the court determines whether the proceedings in the state court amount to a

violation of federal constitutional rights.  *Coleman*, 501 U.S. at 729.  Federal review of a

state court conviction is limited to errors of federal constitutional magnitude which

denied a criminal defendant the right to a fundamentally fair trial.  *Cupp v. Naughton*,

414 U.S. 141, 146 (1973).  Pursuant to 28 U.S.C. § 2254(e), formerly 28 U.S.C. §

2254(d), the state court's determination as to evidentiary matters is presumed to be

correct  unless the federal habeas court concludes that the relevant state court

determination is not fairly supported by the record.  *Sumner v. Mata*, 449 U.S. 539, 546-

47 (1981).  Otherwise, the burden rests on the petitioner to establish, by clear and

convincing evidence, that the factual determination is erroneous.  28 U.S.C. §

2254(e)(1).  Further, § 2254(e) applies, by its terms, "to factual determinations made by

state courts, whether the court be a trial court or an appellate court."  *Sumner*, 449 U.S.

at 547.

A state prisoner applying for a writ of habeas corpus under 28 U.S.C. § 2254 is

not entitled to an evidentiary hearing by the federal court, but the granting of a hearing

is within the discretion of the federal district court.  *Pagan v. Keane*, 984 F.2d 61, 63 (2d

Cir. 1993); *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 4-5 (1992)(citing *Townsend v. Sain*,

372 U.S. 293 (1963)).  The state court's determination is, however, presumed to be

correct unless the federal habeas court concludes that the relevant state court

determination is not fairly supported by the record.  *Sumner*, 449 U.S. at 539, 546-47.

Absent these factors, the burden rests on the petitioner to establish, by clear and

convincing evidence, that the factual determination is erroneous.  *Id*.

In the instant case, the court is in possession of, and has reviewed, the complete

state record, including the motion, hearings and trial transcripts as well as the briefs

filed in connection with the § 330 motion and Petitioner's direct appeal to the Appellate

Division and the New York Court of Appeals.  Petitioner has not requested that the court

conduct an evidentiary hearing prior to resolving his claims for relief and has not

challenged the record below as inaccurate.  Accordingly, the court finds an evidentiary

hearing unnecessary.

Pursuant to 28 U.S.C. § 2254, as amended by AEDPA, a federal court must give

substantial deference to a state court determination that has "adjudicated [the federal

constitutional claim] *on the merits*."  28 U.S.C. § 2254(d) (italics added); *Sellan v.*

*Kuhlman*, 261 F.3d 303, 309-10 (2d Cir. 2001).  Specifically, AEDPA requires that

where a state court has adjudicated the merits of a petitioner's federal claim, habeas

corpus relief may not be granted unless the state court's adjudication

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) ("§ 2254(d)").

In *Williams v. Taylor*, 529 U.S. 362, 413 (2000), the Supreme Court interpreted

the phrases, as used in § 2254(d), "contrary to" and "an unreasonable application of

clearly established Federal law."  According to the Court, a state court decision is

"contrary to clearly established Federal law," 28 U.S.C. § 2254(d)(1), "if the state court

arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of

law or if the state court decides a case differently than [the Supreme Court] has on a set

of materially indistinguishable facts."  *Williams*, 529 U.S. at 413.  A state court decision

involves "an unreasonable application" of Supreme Court caselaw if it "identifies the

correct governing legal principle from [the Supreme Court's] decisions but unreasonably

applies that principle to the facts of [a] prisoner's case."  *Id*.  Both AEDPA, and its

predecessor statute, recognize that a presumption of correctness shall apply to state

court findings of fact.  *Whitaker v. Meachum*, 123 F.3d 714, 715 n. 1 (2d Cir.1997).

AEDPA also requires a petitioner to rebut that presumption by "clear and convincing

evidence."  28 U.S.C. § 2254(e)(1); *Lanfranco v. Murray*, 313 F.3d 112, 117 (2d Cir.

2002).  A presumption of correctness applies to findings by both state trial and appellate

courts.  *Galarza v. Keane, 252 F.3d 630, 635* (2d Cir. 2001); *Whitaker*, 123 F.3d at 715 n.1.

A federal habeas court must apply the § 2254(d) deferential review standard where the state court has "adjudicated [the federal claim] on the merits."  28 U.S.C. § 2254(d).  If the claims have not been adjudicated on the merits, the federal court applies the pre-AEDPA *de novo* review standard, even where the petition was filed after the effective date of the statute.[7]   *See Sellan*, 261 F.3d at 314; *Boyette v. Lefevre*, 246 F.3d 76, 89, 91 (2d Cir. 2001).

In *Sellan*, the Second Circuit held that a federal claim is adjudicated on the merits when the state court "(1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment."  *Sellan*, 261 F.3d at 312.  In other words, to invoke the deferential review standards of § 2254(d)(1), "the state court need only dispose of the [p]etitioner's federal claims on substantive grounds, and reduce that disposition to judgment.  No further articulation of its rationale or elucidation of its reasoning process is required."  *Aparicio v. Artuz*, 269 F.3d 78, 93-94 (2d Cir. 2001), citing *Sellan*, 261 F.3d at 312.  If there is no indication that the federal claim has been decided solely on state procedural grounds, the federal claim will be considered to have been adjudicated on the merits.  *Brown v. Artuz*, 283 F.3d 492, 498 (2d Cir. 2002).  Put another way, the failure to state specific reasons for a state court adjudication on federal claims, regardless of whether denominated as federal in nature, raised on appeal does not

_____

[7] The AEDPA applies to petitions filed on or after the statute's April 24, 1996 effective date.  *See, e.g., Williams v. Taylor* , 529 U.S. 362, 402 (2000) (O'Connor, J., writing for the majority); *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Smith v. McGinnis*, 208 F.3d 13, 15 (2d Cir. 2000) (*per curiam*), *cert. denied*, 531 U.S. 840 (2000).  Thus, the AEDPA applies to the instant petition.

avoid a finding that the state court determination was on the merits of each federal ground presented to the appellate court for purposes of applying AEDPA's deferential standards. *See*, *e.g.*, *Brown*, 283 F.3d at 498 ("[b]ecause there is no basis either in the history of the case or the opinion of the Appellate Division for believing that [petitioner's] Sixth Amendment claim was denied on procedural or any other nonsubstantive grounds, we find that his claim was 'adjudicat[ed] on the merits' by the state court, and therefore review his Sixth Amendment claim under the more deferential standard set forth in § 2254.") (citing *Sellan*, 261 F.3d at 314).

In the instant case, the record establishes that the Appellate Division decided only some of Petitioner's present claims which Petitioner presented to it on the merits when it unanimously affirmed his conviction. *Quiñones*, 773 N.Y.S.2d at 671-72. In particular, only those claims considered by Judge Drury in connection with the § 330 motion were presented on direct appeal. Further, as to the claims addressed by the Appellate Division, nothing indicates that the appellate court relied only on state procedural grounds in affirming the conviction. *See Brown*, 283 F.3d at 498. As such, only those claims considered by Judge Drury in connection with the § 330 motion are exhausted and, thus, before the court on the instant habeas petition.

**2.    Timeliness of Petition**

Review of federal habeas corpus petitions filed by state prisoners on or after April 24, 1996, is governed by the AEDPA, which provides a one-year statute of limitations for the filing of habeas petitions. 28 U.S.C. § 2244(d)(1). Where a habeas petitioner does not file a petition for *certiorari* in the United States Supreme Court, the petitioner's

state court conviction becomes final, for purposes of triggering the one-year limitations period in which to seek habeas relief, 90 days after the application for leave to appeal to the relevant state's highest court is denied.  *McKinney v. Artuz*, 326 F.3d 87, 96 (2d Cir. 2003).

In the instant case, because Petitioner did not seek certiorari in the Supreme Court, his conviction became final on September 21, 2004, *i.e.*, 90 days after the June 23, 2004 denial of leave to appeal to the Court of Appeals.  Accordingly, Petitioner's habeas petition, filed on July 20, 2005, was filed within AEDPA's one-year filing period, and thus is timely.  Respondent does not contend otherwise.

3.    **Merits of Petition**

The test for an alleged denial of due process based upon prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.  *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor").  To deny a habeas petitioner due process based on prosecutorial statements, the statements have to have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 182 (1986); *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir. 1990).  "In evaluating whether allegedly improper comments by the prosecutor are grounds for reversal, the fundamental question is whether, if there was misconduct, it caused substantial prejudice to the defendant, thereby depriving him of his right to a fair trial." *United States v. LaMorte*, 950 F.2d 80, 83 (2d Cir. 1991) (citing *United States v. Bivona*, 786

F.2d 504, 514 (2d Cir.), *cert. denied*, 479 U.S. 827 (1986)).  In determining the degree

of prejudice to a petitioner, the factors to consider are the severity of the misconduct,

the measures adopted to cure the misconduct, and the certainty of conviction based on

the evidence absent the misconduct.  *United States v. Young*, 470 U.S. 1, 12-14 (1985);

*La Morte*, 950 F.2d at 83; *Floyd*, 918 F.2d at 356.

Thus, no matter how improper the prosecutor's comments were, the only concern

of the court in reviewing a claim of prosecutorial misconduct on a federal habeas

petition is the fundamental fairness of the trial.  *Donnelly v. DeChristoforo*, 416 U.S.

637, 645 (1974).  Further, statements made by prosecutors in their summation, even if

seemingly improper, do not necessarily exceed "the broad range of rhetorical comments

allowed in closing arguments."  *Harper v. Kelly*, 704 F.Supp. 375, 379 (S.D.N.Y. 1989),

*rev'd on other grounds*, 916 F.2d 54 (1990).  *See also Donnelly*, 416 U.S. at 646-47

(isolated passages of a prosecutor's argument, even if imperfect, do not suggest that a

jury will be so profoundly affected so as to affect the fundamental fairness of a trial).  On

the instant record, none of the alleged incidents of prosecutorial misconduct, either

alone or cumulatively, provides grounds for habeas relief.

Initially, the court observes that in addition to the four statements specifically

considered by Judge Drury with regard to the § 330 motion, Petitioner references

numerous other statements Carrington that allegedly constituted prosecutorial

misconduct.  Petition at 5, 9-11.  A review of the record, however, establishes that

although defense counsel voiced general objections to some of these additional

statements, some of which were sustained, no curative instruction was sought by

defense counsel and, as such, the claims as to those statements have not been

preserved for habeas review.  *Garvey v. Duncan*, 485 F.3d 709, 714-15 (2d Cir. 2007) (holding that because a general objection fails to alert the court to the defendant's position, it is insufficient to preserve the issue for further review under § 2254).  Further, as to those statements for which no objection was made, such claims are not preserved for review.  *Garvey*, 485 F.3d at 714-15.  The court thus addresses only the same four statements considered by Judge Drury in connection with the § 330 motion.

The first statement challenged by Petitioner is the prosecutor's remarks that Rosa was "brave" and "put his own life in jeopardy" by agreeing to testify at Petitioner's trial."  Tr. at 54-55.  Petitioner maintains such statement impermissibly bolstered Rosa's testimony by offering an opinion vouching for Rosa's credibility.  Petition at 7.  Such statement, although improper insofar as the prosecutor was acting as a witness, was based on  trial testimony, including that Rosa observed Petitioner wantoly spray Rosa's vehicle with bullets, including one that killed his friend.  Further, insofar as the prosecutor commented that she believed the jurors saw Rosa shaking while on the witness stand because the prosecutor made such observation, Tr. at 55, Judge Drury also observed that several witnesses were able to see that Rosa "visibly shaking on the witness stand."  May 4, 2000, § 330 Motion Decision.  Significantly, Petitioner does not challenge Judge Drury's finding.  The prosecutor thus was only commenting on what had occurred at trial in the jury's presence, and what was potentially relevant to its determination of the witness's credibility, which, as such, provides no basis for habeas relief.  *See Brinson v. Walker*, 407 F.Supp.2d 456, 473 (W.D.N.Y. 2006) (prosecutor's comments regarding the "nice fancy suits" the defendant wore at trial were sarcastic and ill-advised, but were not so prejudicial as to deny defendant a fair trial).  Moreover,

insofar as the challenged remark was an attempt to vouch for Rosa's credibility, it was permitted given defense counsel's relentless attacks on Rosa's credibility.  *See Darden*, 477 U.S. at 182 (finding no substantial prejudice in part because "[m]uch of the objectionable content was invited by or was responsive to the opening summation of the defense."); *United States v. Perez*, 144 F.3d 204, 210 (2d Cir. 1998) ("Prosecutors have greater leeway in commenting on the credibility of their witnesses when the defense has attacked that credibility."); *United States v. Perry*, 643 F.2d 38, 51 (2d Cir. 1981) ("[I]n light of the fact that the defense lawyers attacked the credibility and honesty of the Government's case in their closings, the Government's statements vouching for witnesses were understandable if not laudable.").  Thus, the prosecutor's remarks concerning Rosa's credibility on this point provide no basis for relief.

The second statement preserved for habeas review is the prosecutor's remark regarding Rosa's conviction on a felony weapons possession charge some time after the murder, essentially stating that Rosa, out of fear for his life after having identified Petitioner as the murderer, carried the weapon because Rosa was "probably terrified walking the streets."  Petitioner. Tr. at 69.  Judge Drury sustained the objection, and directed the jury to "disregard" the remark.  Tr. at 69.  Although this comment was improper as speculative, the record indicates it was a single and brief remark that was not so egregious as to infect the fairness of the entire trial and thus deprive Petitioner of due process.  Moreover, because defense counsel used Rosa's felony weapons possession conviction in an attempt to undermine the credibility of Rosa's testimony, Tr. at 124-25 (cross-examination of Rosa); 336-37 (defense summation), the prosecutor was afforded "greater leeway" in supporting Rosa's credibility.  *See Darden*, 477 U.S. at

182; *Perez*, 144 F.3d at 210; and *Perry*, 643 F.2d at 51.   In other words, fairly considered in the context of the entire trial, the prosecutor's statements Petitioner challenges as misconduct were made in an effort to rebut defense counsel's arguments for acquittal based on Rosa's lack of credibility.   This issue was therefor fair game for Carrington's rebuttal efforts in this case.   *See Okehoffurum v. Kean*, 1996 WL 1086073, * 5 (E.D.N.Y. July 2, 1996) (finding no merit to argument asserted in support of habeas petition that prosecutor's comments during closing arguments amounted to prosecutorial misconduct where challenged comments merely rebutted defense counsel's closing argument).   As such, this comment is not a ground for habeas relief.

In the third statement preserved for habeas review, the prosecutor commented that "[t]he bravest thing Carlos Rosa has ever done in his life is come into this courtroom and accuse that man [Petitioner] of killing his friend . . . .[because] no one in this courtroom, save him [Rosa], knows how vicious this man [Petitioner] is - -." Summation Tr. at 48.   Judge Drury gave a curative instruction, advising the jury they were free to accept or disregard the attorney's closing arguments based on how much sense the arguments made.   Summation Tr. at 48-49.   A plain of the record establishes that the such statement was strong rhetoric regarding the overall proof at trial which did not so profoundly affect the jury as to render the entire trial fundamentally unfair particularly in light of other persuasive evidence demonstrating Petitioner's guilt. *Donnelly*, 416 U.S. at 646-47; *Harper*, 704 F.Supp. at 379.   Indeed, if the jury believed that Petitioner was the shooter, that conclusion was more logically based on the totality of the evidence, including Rosa's credibility, rather than his "bravery."   It may be presumed that a well-instructed jury is intelligent enough to know from daily life

22

experiences that one's personal courage, or lack thereof, is irrelevant to one's capacity for truth telling.

The final statement challenged by Petitioner includes the prosecutor's characterization of the murder as an "execution" that Petitioner committed in the presence of friends and in a familiar neighborhood so as to reduce the possibility that any of the witnesses would cooperate with the subsequent police investigation. Summation Tr. at 61-62.  Judge Drury overruled defense counsel's objection to this comment.  Summation Tr. at 62.  In ruling on the § 330 motion, Judge Drury explained that he did not sustain the objection because there was merit to the prosecutor's argument that the perpetrator of a murder would likely choose to kill while in a neighborhood which included the presence of people among whom the murderer felt comfortable so as not to be detected.  May 4, 2000, § 330 Motion Decision at 6.   Judge Drury further explained that although the shooting was technically not an "execution," the prosecutor's characterization of it as such, although an exaggeration, "implie[d] being killed helplessly," a meaning which also applied to the murder of Martinez.  May 4 2000, § 330 Motion Decision at 8.  Based on the record, no evidence remotely suggests Martinez provoked the shooting.

Even assuming, *arguendo*, that the fourth statement was improper, it was not so "inflammatory and egregious" as to "require a finding of substantial prejudice."  *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990).  Objectively analyzed, the prosecutor's characterization of the murder as an "execution" is factually irrelevant to the question at trial of who shot Martinez.  Further, the prosecutor's surmise that the shooter would have chosen to commit the crime while in the company of friends in a familiar

neighborhood, constitutes nothing more than rhetorical comment based on the other evidence in the record, which failed to render the entire trial fundamentally unfair. *Donnelly*, 416 U.S. at 646-47; *Harper*, 704 F.Supp. at 379.  Significantly, Petitioner points to no Supreme Court decision on similar facts holding that similar comments by a prosecutor in summation violate due process.  Habeas relief is not mandated based on the fourth statement.

Although two of the prosecutor's statements were considered by Judge Drury improper so as to require a curative instruction, such statements, neither individually nor cumulatively, resulted in a denial of due process requiring habeas relief.  To determine whether prosecutorial misconduct amounted to the "substantial prejudice" necessary to warrant habeas relief, the court considers "the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements."  *Floyd*, 918 F.2d at 343.

In particular, Carrington's statements did not permeate the trial, nor was the cumulative effect of the challenged statements sufficiently inflammatory or egregious as to require a finding of substantial prejudice.  *Darden*, 477 U.S. at 179-82; *Floyd*, 918 F.2d at 356.  Moreover, although Rosa was the only eyewitness to the shooting, and no other evidence directly pointed to Petitioner as the shooter, especially given that the murder weapon was never found, several key elements of Rosa's testimony were substantially corroborated by circumstantial evidence presented at trial.

Specifically, the testimony of Virgin's neighbor Elliott that two Hispanic men run past her home, as if fleeing from the area where the shooting occurred, and heard gunshots at the time of the shooting, Tr. at 55-65, is consistent with Rosa's testimony

24

that two other Hispanic males, Junior and Victor, Petitioner's brother, were standing with Petitioner in front of Virgin's apartment just prior to the shooting.  Grimes's testimony about a .38 caliber bullet being shot into his apartment, located behind the area where the shooting occurred, Tr. at 66-68, is consistent with the prosecution's theory that the shot that killed Martinez was fired from outside Rosa's vehicle.  Similarly, that the shattered glass from the rear window of Rosa's station wagon was largely contained within the vehicle's cargo area, and the presence of other fired bullets in the vehicle's wheel well, corroborate Rosa's testimony that shots were fired from someone standing behind the vehicle, rather than from inside the vehicle, or some other position.

Sr. Firearms Examiner Pandolfino, testifying as an expert, stated that the bullets recovered from Grimes's apartment, the curb at the intersection of Efner and Virginia Streets, and from within the vehicle were all fired from a .38 caliber weapon and would have the ability to travel between one-half to three-quarters of a mile, within the area adjacent to witness Grimes's apartment. Tr. at 262-75.  Significantly, Dr. Baik testified that the victim's fatal injury was a "through and through wound," wherein the bullet enters, then exits, the body, causing the type of wound that a .38 caliber bullet is capable of producing, Tr. at 288-90, 309-10, and the bullet recovered from the floor of the vehicle's front passenger compartment floor, bearing trace evidence of human tissue, was the same .38 caliber.  Tr. at 230, 255-56.

Such evidence strongly corroborates Rosa's testimony, such that the prosecutor's sporadic improper comments during summation cannot be found to have so "infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 182; *Floyd*, 907 F.2d at 353.  Moreover, Petitioner fails

to point to any Supreme Court case, for which the facts are "materially indistinguishable" from the instant case, holding that such comments made during the prosecutor's summation required reversal of the conviction, *Williams*, 529 U.S. at 413 (construing 28 U.S.C. § 2254(d)(1)'s requirement that habeas relief be granted only where a state court decision is "contrary to clearly established Federal law" by the Supreme Court), and the court's research reveals none.[8]   For example, in *Darden*, *supra*, the most recent Supreme Court decision addressing a due process claim for habeas relief based on prosecutorial misconduct during summation, the Court refused to grant habeas relief notwithstanding the prosecutor's summation which described the defendant as an "animal."  *Darden*, 477 U.S. at 180-82.  Contrasted with the inflammatory comment challenged in *Darden*, the prosecutor's comments at issue in this case appear benign. There is thus no basis for habeas relief based on any prosecutorial misconduct during summation and the Petition should be DISMISSED as without merit.

---

[8] The lower court cases on which Petitioner relies in support of his argument, Petition at 12-13, that the prosecutor's improper remarks require federal habeas relief are factually distinguishable from the instant case.  *See United States v. Hand*, 184 F.3d 1322, 1332-33 (11th Cir. 1999) (ten of fourteen pages of transcript of prosecutor's summation contained multiple repetitions of words  "monster," "wicked," "vicious," and "maniac" calculated to persuade jury to decide case based on emotions rather than evidence); *United States v. Cannon*, 88 F.3d 1495, 1503 (8th Cir. 1996) (referring to African-American defendants as "bad people," commenting on fact they were "not locals," and as the evidence at trial against defendants was "weak" required reversal); *United States v. Modica*, 663 F.2d 1173, 1180 (2d Cir. 1981) (prosecutor's improper summation comments, including vouching for witness's veracity, characterizing prosecution witness as "scared," telling jury not to let defendant "walk out of this room laughing at you," and use of personal pronoun "I" more than 60 times, although improper, did not require reversal in light of overwhelming evidence against defendant); *People v. Rudd*, 509 N.Y.S.2d 143, 145-46 (App. Div. 2d Dep't 1984) (reversing conviction and remanding for new trial based on prosecutor's summation comments that "grossly distorted" evidence presented at trial); and *People v. Walker*, 411 N.Y.S.2d 377 (App. Div. 2d Dep't 1978) (prosecutor's use, during summation, of racial slur as evidence of defendant's social status required reversal and new trial).  Further, insofar as Petitioner cites *Hall v. United States*, 418 F.2d 582, 587 (2d Cir. 1969), in support of the Petition, no relevant case exists under that name or citation.

## CONCLUSION

Based on the foregoing, the Petition should be DISMISSED.

Further, as the court finds there is no substantial question presented for appellate review, a certificate of appealability should not issue.  28 U.S.C. § 2253, as amended by the Antiterrorism and Effective Death Penalty Act of 1996.

Respectfully submitted,

/s/ *Leslie G. Foschio*

_____

LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE

DATED:      January 24, 2008
            Buffalo, New York

Pursuant to 28 U.S.C. §636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.**

*Thomas v. Arn,* 474 U.S. 140 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir. 1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Petitioner and Respondent.

SO ORDERED.

/s/ *Leslie G. Foschio*
_____
LESLIE G. FOSCHIO
UNITED STATES MAGISTRATE JUDGE


DATED:     January 24, 2008
           Buffalo, New York